SAFECO INSURANCE COMPANY OF
AMERICA, Plaintiff,

and

The Aetna Casualty and Surety
Company, Intervenor,

v.

William A. SANDERS, as surviving parent and next of kin and in his capacity as Personal Representative of the Estate of Laura Lee Sanders, deceased; Tena Houghton, as surviving spouse and next of kin of Michael Houghton, deceased; Ashley Houghton, as surviving parent and next of kin of Michael Houghton, deceased, Defendants.

No. 73069.

Supreme Court of Oklahoma.

Dec. 4, 1990.

As Corrected Dec. 7, 1990.

Richard Carpenter and Chris Knight, Sanders & Carpenter, Tulsa, for plaintiff.

Jack Y. Goree, Goree, King, Rucker & Finnerty, Tulsa, for intervenor.

Greg A. Farrar, Farrar & Farrar, Tulsa, for defendant William A. Sanders.

R. Scott Savage and J. Randall Miller, Moyers, Martin, Santee, Imel & Tetrick, Tulsa, for defendants Tena Houghton and Ashley Houghton.

ALMA WILSON, Justice:

On the evening of October 6, 1987, Laura Lee Sanders and Michael Houghton were seated in a 1967 Oldsmobile Cutlass parked in a parking lot in the Brookside area on South Peoria Street in the City of Tulsa. They were approached and subdued through a show of force by Scott Allen Hain and Robert Wayne Lambert. Hain and Lambert forced Sanders to drive. After driving for a period of time, Sanders was directed to stop. Hain and Lambert ordered Houghton out of the car. Hain and Lambert took Houghton's money and keys to his truck which was parked at the site of the abduction, then, tied up Houghton and locked him in the trunk of the car. Either Hain or Lambert drove the car a short distance then stopped and they locked Sanders in the trunk with Houghton. Hain or Lambert then drove the car back to the site of the abduction, the parking lot on South Peoria.

From the parking lot, with Hain driving the car and Lambert driving Houghton's truck, they drove to an isolated area near Sapulpa, Oklahoma. Both vehicles were stopped. With Sanders and Houghton locked in the trunk, Hain and Lambert began cutting the fuel line of the car. Hain and Lambert completed cutting the fuel line, the fuel line was ignited, and the car burned. Hain and Lambert left the scene in Houghton's truck. Sanders and Houghton died as a result of thermal burns and smoke inhalation sustained while in the trunk of the car.

The 1967 Oldsmobile Cutlass was insured by Safeco Policy No. J 296000, purchased by William Sanders, father of Laura Lee Sanders. The policy provides $100,-000/$300,000 uninsured motorist coverage. Houghton's 1985 Isuzu truck was insured by Aetna Policy No. 218SX2367168PCH.

Personal representatives of the insureds (insureds) submitted claims to Safeco Insurance Company of America (insurer) for uninsured motorist coverage for the deaths. Safeco denied the claims and filed this declaratory judgment action in the federal district court. The Aetna Casualty and Surety Company (insurer) was permitted to intervene in this action. Upon submission of proposed undisputed facts and legal authorities from the parties, the federal district court certified the relevant facts and four questions of law to this Court, pursuant to the Uniform Certification of Questions of Law Act, 20 O.S.1981, § 1601, et seq.

The certified questions present first impression issues as to whether loss (personal injury or death) is sufficiently related to

the use of a motor vehicle by an uninsured operator to come within UM coverage as contemplated by 36 O.S.1981, § 3636. Our decisional insurance law and the plethora of decisions from our sister jurisdictions involving similar issues reveal a common rule that these issues turn on the particular and unique facts in each case.

The four certified questions inquire as to the governing law and conclusions of fact. The governing law is set forth in answer to these questions. Inferences and conclusions to be drawn from the facts are matters to be determined by the trial court. Accordingly, the questions are answered, as follows:

1. Does the murder of Sanders and Houghton when they were murdered by being burned to death in the trunk of the automobile in question "arise out of the ... use of a motor vehicle" as contemplated by 36 O.S.1981, § 3636? Yes.

2. If the deaths arose out of the use of a motor vehicle, was there a causal connection between the use of the vehicle and the murders? Yes.

3. If the causal connection existed, do the acts of Hain and Lambert after the car was parked, constitute acts of independent significance to sever any causal link? Yes.

4. Were Hain and Lambert "operators of (an) uninsured motor vehicle" when they set the vehicle on fire and murdered Sanders and Houghton? No.

## I.

INJURY RESULTING FROM A CHAIN OF EVENTS WHICH STARTS WITH THE USE OF A MOTOR VEHICLE AS THE DANGEROUS INSTRUMENTALITY ARISES OUT OF THE USE OF THE MOTOR VEHICLE.

■ The phrase "arising out of the ownership, maintenance or use of a motor vehicle" in 36 O.S.1981, § 3636 is descriptive of the coverage of the liability insurance policy with which the insured must be of-

fered uninsured motorist coverage. The courts often commingle or treat as synonomous the issues of 1) whether injury arises out of the use of a motor vehicle and 2) whether injury is caused by the use of a motor vehicle.[1] This Court has not decided the meaning of "arising out of the ownership, maintenance or use of a motor vehicle" as contemplated by 36 O.S.1981, § 3636, nor established a causal connection test for uninsured motorist insurance (UM) coverage.

The pertinent parts of 36 O.S.1981, § 3636 [2] state:

(A) No *policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person arising out of the ownership, maintenance or use of a motor vehicle* shall be issued, delivered, renewed, or extended in this state with respect to a motor vehicle registered in this or principally garaged in this state unless the policy includes the coverage described in subsection (B) of this section.

(B) The *policy* referred to in subsection (A) of this section *shall provide coverage therein or supplemental thereto for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles or hit-and-run motor vehicles because of bodily injury, sickness or disease, including death resulting therefrom.* Coverage shall not be less than the amounts or limits prescribed for bodily injury or death for a policy meeting the requirements of Section 7–204 of Title 47, Oklahoma Statutes, as the same may be hereafter amended....

(Emphasis added.)

The legislative mandate of § 3636 is clear on its face. An insurer, issuing or renewing a motor vehicle liability insurance contract on a vehicle registered in this

---

1. "Automobile Liability Insurance: What are accidents or injuries 'Arising out of Ownership, Maintenance, or Use' of Insured Vehicle," Annot. 15 A.L.R.4th 10 (1982).

2. The last amended version of § 3636 is in 1990 Okla.Sess.Laws, § 4, ch. 297. The language emphasized in this opinion has not been amended and remains a part of the statute.

state, shall offer UM coverage to the insured for damages from owners or operators of uninsured motor vehicles. The UM coverage shall protect the insured from personal injury damages for which the insured is legally entitled to recover from an owner or operator of an uninsured motor vehicle. This legislative mandate may not be diluted.[3]

As used in § 3636, the phrase "arising out of the ownership, maintenance or use of a motor vehicle", in ordinary and comprehensive words, encompasses a broad spectrum of factual sequences which might result in injury covered by the liability insurance policy. The phrase was first used in our statutes mandating public liability insurance.[1] Prior to enactment of our motor vehicle insurance statutes, the legal effect of the phrase "arising out of the ownership, maintenance or use of a motor vehicle", as used in motor vehicle liability insurance contracts, was decided in *Oklahoma Farm Bureau Mutual Insurance Co. v. Mouse*, 268 P.2d 886, 889 (Okla.1954).

In *Mouse*, while transporting a combine, the breather pipe on the combine lodged in the top of a bridge. The truck was stopped and Mouse was directed to climb upon the combine and dislodge the breather pipe. Mouse fell to the pavement and was seriously injured. In considering whether the truck was the mechanism that caused Mouse's injury, this Court said that in all reported cases where the cause of the injury was something physically attached to or immediately connected in some manner to the vehicle or its operation, the injury resulted from the use of the vehicle, even though some courts have adopted a broader definition. Upon examination of the chain of events, this Court concluded that the breather pipe, part of the vehicle within the contract, was the dangerous instrument that started the chain of events which resulted in Mouse's injury and therefore, Mouse's injury arose out of the use of the vehicle.

The *Mouse* chain of events test established the legal application of the phrase at the time it was first enacted by the Legislature.[5] In *Mouse*, "arising out of the use of the vehicle" and "caused by" have synonomous import for purposes of liability insurance. However, the legislative mandate in § 3636 is that UM coverage shall include injury for which the owner or operator of an uninsured motor vehicle is liable. For purposes of UM coverage, the broad spectrum of factual sequences within "arising out of the ownership, maintenance or use of a motor vehicle" is limited by § 3636 to factual sequences involving an uninsured motorist. Thus, in ascertaining the scope of the mandated UM coverage "arising out of the use of a motor vehicle" and "caused by" or causal connection are not synonomous.

After thorough review of the case law in the various jurisdictions, we think the *Mouse* chain of events test remains appropriate for deciding whether the facts show that an injury arises out of the ownership, maintenance or use of a motor vehicle. The chain of events test is similar to tests fashioned by other jurisdictions in determining the meaning of the phrase as used

---

**3.** *State Farm Automobile Insurance Co. v. Greer,* 777 P.2d 941 (Okla.1989); *State Farm Mutual Automobile Insurance Co. v. Wendt,* 708 P.2d 581 (Okla.1985); *Brown v. United Services Automobile Association,* 684 P.2d 1195 (Okla.1984); *Heavner v. Farmers Insurance Co.,* 663 P.2d 730 (Okla.1983); *Uptegraft v. Home Insurance Company,* 662 P.2d 681 (Okla.1983); *Lake v. Wright,* 657 P.2d 643 (Okla.1982); *Chambers v. Walker,* 653 P.2d 931 (Okla.1982); *Porter v. MFA Mutual Insurance Co.,* 643 P.2d 302 (Okla.1982); *Biggs v. State Farm Mutual Insurance Co.,* 569 P.2d 430 (Okla.1977); *Cothren v. Emasco Insurance Company,* 555 P.2d 1037 (Okla.1976); *Keel v. MFA Insurance Company,* 553 P.2d 153 (Okla. 1976).

**4.** 47 O.S.1981, § 7–101 et seq (financial responsibility statutes) and 47 O.S.1981, § 7–601 (compulsory liability statute).

**5.** In interpreting statutes, the Legislature is presumed to be knowledgeable of the status of the law, including the judicial opinions, relating to the subject of the statute, *LeKan v. P & L Fire Protection Co.,* 609 P.2d 1289 (Okla.1980); *Garrison v. State,* 420 P.2d 474 (Okla.1966). The financial responsibility statutes were enacted in 1961 Okla.Sess.Laws, ch. 10b, Art. III § 7–301 et seq; uninsured motorist statute enacted in 1968 Okla.Sess.Laws, ch. 106, § 2; and, compulsory liability statute enacted in 1976 Okla.Sess.Laws, ch. 176, § 1.

in the statutes and insurance contracts.[6] Accordingly, we hold that if the facts establish that a motor vehicle or any part of the motor vehicle is the dangerous instrument which starts the chain of events leading to the injury, the injury arises out of the use of the motor vehicle, as contemplated by 36 O.S.1981, § 3636.

## II.

## USE OF AN UNINSURED MOTOR VEHICLE, WHICH IS RELATED TO ITS TRANSPORTATION NATURE AND WHICH RESULTS IN INJURY, IS CAUSALLY CONNECTED TO THE INJURY.

■ Causal connection between the use of a motor vehicle and personal injury within the context of "arising out of the ownership, maintenance or use of a motor vehicle" and within the context of "caused by accident" has been raised in a myriad of fact situations.[7] Whether causal connection is examined within the confines of statutory language or insurance contract provisions, the courts agree that causal connection is a question of fact and, in an insurance controversy, the burden is less than proximate cause in a tort case.[8]

The insurers urge that UM coverage is limited to injury caused by the negligent and ordinary transportation use of the motor vehicle. We disagree, § 3636 does not expressly omit damages for personal injury caused by intentional acts from UM coverage, nor does it limit UM coverage to injury caused by "ordinary" transportation use of a vehicle. The Legislature's use of the phrase, "uninsured motorist" in the titles to its bills [9] implies an intent that the injury be connected to a *motorist's* use of a vehicle. The requirement in subsection B of § 3636 that the insured be legally entitled to recover damages from the owner or operator of an uninsured motor vehicle implies an intent that there be a connection between the motoring or transportation use (use related to the inherent nature of a motor vehicle) by an uninsured motorist and the injury to the insured. Therefore, a two-prong test is necessary to determine whether an injury is within the UM coverage contemplated by § 3636: 1) is a use of the vehicle connected to the injury; and, 2) is that use related to the transportation nature of the vehicle. If the injury is within the mandate of § 3636, then it is causally connected to the use of an uninsured motor vehicle.

The Legislature defined "motor vehicle" in the original enactment of § 3636, codi-

6. *Associated Independent Dealers, Inc. v. Mutual Service Insurance Companies,* 304 Minn. 179, 229 N.W.2d 516 (1975) relationship between injury and ownership, maintenance or use of a motor vehicle must be natural and reasonable incident or consequence of the use of the vehicle; *Allstate Insurance Co. v. Gillespie,* 455 So.2d 617 (Fla.App.D2, 1984) inquiry is whether injury "flowed from" the use of the vehicle; and *Georgia Farm Bureau Mutual Insurance Co. v. Burnett,* 167 Ga.App. 480, 306 S.E.2d 734 (1983) injury arises out of use of motor vehicle where injury "grew out of" use of motor vehicle and thus there is a causal connection.

7. See footnote 1, supra.

8. *Criterion Insurance Co. v. Velthouse,* 751 P.2d 1 (Alas.1986); *Race v. Nationwide Mutual Fire Insurance Co.,* 542 So.2d 347 (Fla.1989); *Government Employees Insurance Company v. Novak,* 453 So.2d 1116 (Fla.1984); *Detweiler v. J.C. Penney Casualty Insurance Co.,* 110 Wash.2d 99, 751 P.2d 282 (1988).

9. The title to an act fixes the scope of the subject of the act and is a guide to legislative intent.

*Oklahoma City v. Brient,* 189 Okla. 163, 114 P.2d 459 (1941); *Independent School District No. 89 of Oklahoma County v. Oklahoma City Federation of Teachers, Local 2309 of American Federation of Teachers,* 612 P.2d 719 (Okla.1980). The bill first enacting uninsured motorist coverage is in 1968 Okla.Sess.Laws, ch. 106, § 2. The title to the act states:

AN ACT RELATING TO INSURANCE; REQUIRING THAT AN "UNINSURED MOTORIST CLAUSE" BE CONTAINED IN EVERY AUTOMOBILE LIABILITY INSURANCE POLICY; PRESCRIBING THE LIMITS OF LIABILITY OF SUCH COVERAGE; PROVIDING FOR AN INSOLVENCY CLAUSE; PROVIDING EXCEPTIONS; DEFINING TERMS; ESTABLISHING AN EFFECTIVE DATE FOR THIS ACT; DIRECTING CODIFICATION; PROVIDING FOR SEVERABILITY OF THE ACT; AND REPEALING CONFLICTING LAWS.

The title to the most recent bill amending the statute, 1990 Okla.Sess.Laws, ch. 297, § 4, states in part, ... AMENDING 36 O.S.1981, SECTION 3636, AS AMENDED BY SECTION 1, CHAPTER 98, O.S.L.1989, WHICH RELATES TO UNINSURED MOTORIST COVERAGE....

fied at 36 O.S.1981, § 3635. No other statutory definitions are provided. Jurisprudence of this and other jurisdictions teaches that terms such as "motorist", "operator", and "transportation use" cannot be conclusively defined. Thus, whether a use of an uninsured motor vehicle is related to the transportation nature of the vehicle is necessarily a question of fact to be determined in each case.

In *Detweiler v. J.C. Penney Casualty Insurance Company*, the Washington Supreme Court remanded for factfinding as to the affect of the movement of the truck when the insured was injured while shooting at his truck to stop the theft of his truck by an uninsured driver. In *Alabama Farm Bureau Mutual Casualty Insurance Co. v. Mitchell*, 373 So.2d 1129 (Ala. App.1979), the insured was beaten by her yard man, put into the trunk of her automobile, driven for some distance, then abandoned in the trunk of the automobile. The insured died from lack of food, water and oxygen. The court remanded the case for decision by the trier of facts on the issue of whether the death was caused by the use of the automobile.

And, in *Casualty Reciprocal Exchange v. Waggoner Drilling Co.*, 340 P.2d 490 (Okla.1959), the facts established that the reassembly of a rig was within the contemplated "operation and use" clause in the insurance contract. In that case the vehicle was off-road and stationary and a wench on the vehicle was being used in the reassembly of a drilling rig. We held that "operation and use" included any use which had a proximate and necessary connection to the use of the vehicle and that the reassembly of the rig was within the "operation and use" clause, even though the statute mandating the coverage required liability insurance for the use or operation of a motor carrier upon the public highways.

Insurers contend that the use of the car was not related to transportation, but that it was merely the situs of the deaths which could have just as easily occurred outside the automobile. The automobile is far more than the mere situs in this case. It is the deadly instrumentality, according to the certified relevant facts. The authorities cited by insurers in support of this constrained argument are factually inapposite,[10] yet they demonstrate the necessity of a two-prong causal connection test for determining uninsured motorist coverage.

In *Gilbertson v. State Farm Mutual Automobile Insurance*, the Plaintiffs sought compensation under the uninsured motorist provisions of their policy. Summary judgment in favor of the insurer was appealed to the Court of Appeals for the Tenth Circuit. The facts were that the tortfeasor was balancing a 51-pound rock on a ledge of an overpass when the rock fell onto the Plaintiffs' truck as it travelled on the road below. The injury occurred in Oklahoma, but Minnesota law was applied as the insureds were residents of Minnesota and the policy was issued in Minnesota. The Minnesota statute expressly required insurance coverage for injury caused by the use of a motor vehicle *as a vehicle*.[11] The Tenth Circuit acknowledged that in Minnesota the injury must arise out of the transportation use of a vehicle, citing *Fire and Casualty Insurance Co. of Connecticut v. Illinois Farmers Insurance Co.*, 352 N.W.2d 798 (Minn.Ct.App.1984) and *Haagenson v. National Farmers Union Prop-*

---

10. *Gilbertson v. State Farm Mutual Automobile Insurance Co.*, 845 F.2d 245 (10th Cir.1985); *Love v. Farmers Ins. Group*, 121 Ariz. 71, 588 P.2d 364 (Ariz.Ct.App.1978), where insured was abducted and, using a candelabrum, the passenger assailant fatally beat the insured, while the other assailant drove to remote area, Court found automobile was mere situs and the death did not arise out of the use of the automobile; *Davis v. Criterion Ins. Co.*, 179 Ga.App. 235, 345 S.E.2d 913 (1986), where passenger forced bus driver to deviate from route and park bus, then attacked and murdered bus driver, Court found the bus was not intrinsically related to the death, but was the situs of the criminal act; and *Edwards v. State Farm Ins. Co.*, 399 N.W.2d 95 (Minn.App.1986), where insured was abducted, driven 30 miles, raped and murdered in the automobile, the Minnesota Court found the vehicle was not required to inflict the injuries that resulted from violent actions and not from the use of the vehicle.

11. Minn.St. 65B.43, subd. 3, expressly states, "... use of a motor vehicle as a vehicle." *See also, Continental Western Insurance Co. v. Klug*, 415 N.W.2d 876 (Minn.1987).

*erty and Casualty Co.*, 277 N.W.2d 648 (Minn.1979). However, the Tenth Circuit affirmed summary judgment in favor of the insurer on the basis that the causal connection was severed by the exiting from the car, the removing of the rock from the vehicle, the balancing of the rock on the overpass ledge and the falling of the rock from the overpass, which taken together constituted acts of independent significance to break the causal connection.

The Minnesota "transportation purposes" rule was applied in a more recent decision of the court of appeals to include injury resulting from a gas fumes fire. In *Strand v. Illinois Farmers Insurance Company*, 429 N.W.2d 266 (Minn.App. 1988), gasoline leaked from the involved car while it was housed in an enclosed garage overnight. The gasoline fumes were ignited by the flame in the water heater when the garage door was opened. The insured was in the garage at the time of the fire which resulted in injury to the insured. The Minnesota court found that the vehicle was an active accessory in causing the injury; that there was no intervening independent act which severed the causal link; and, the gasoline was clearly attributable to the use of the car for transportation purposes, thus the injury resulted from the use of the car for no-fault insurance purposes.

Similarly, the Hawaii Supreme Court held in favor of the insured in *National Union Fire Insurance Company of Pittsburgh, Pa. v. Olson*, 69 Haw. 559, 751 P.2d 666 (1988). The ambulance attendant was injured while lighting flares to guide the traffic on the highway. The court concluded that the injury arose out of the use of the a motor vehicle as the activity was reasonably calculated to protect the ambulance and related to the contemplated use purposes of the ambulance.

Causal connection between the injury to the insured and the use of a motor vehicle

related to its transportation nature, thus use of the vehicle by an *uninsured motorist*, is a question of fact to be determined in each case. Accordingly, we hold that the use of an uninsured motor vehicle is causally connected to the injury, and the injury is within the mandated UM coverage of § 3636, where the facts establish that the use of an uninsured motor vehicle is related to its transportation nature and injury is connected to that use.

### III.

ACTS OF AN UNINSURED MOTORIST WHICH ARE NOT RELATED TO THE TRANSPORTATION NATURE OF A MOTOR VEHICLE AND WHICH RESULT IN INJURY TO THE INSURED CONSTITUTE ACTS OF INDEPENDENT SIGNIFICANCE TO SEVER THE CAUSAL CONNECTION BETWEEN THE USE OF A MOTOR VEHICLE AND THE INJURY.

■ The insurers, in support of denial of the UM claims, argue that the deaths were caused by independent, intervening criminal acts and neither the statute nor the insurance contracts provide coverage for death caused by intentional criminal acts. In response, the insureds assert that causal connection is not severed because the acts of the wrongdoers are intentional criminal acts and that the intent of the wrongdoers is irrelevant to UM coverage.

We agree with the insureds that neither the criminal nature of the wrongful acts nor the intent of the wrongdoers is an element in determining first-party UM coverage.[12] The clear, plain mandate in § 3636 is that the insureds shall be protected from injury caused by wrongdoing owners or operators of uninsured vehicles. The statute does not classify injury or use of the vehicle to exclude from the mandated UM coverage injury resulting from acts of a criminal or intentional nature. Although § 3636 is silent as to intent of the insured or the uninsured motorist, exami-

---

12. In *Uptegraft v. Home Insurance Co.*, 662 P.2d at p. 684 footnote 6, we said, "Because it is a promise by the insurer to pay its own insured rather than a promise to pay some third party, the coverage is understood, in insurance parlance, as "first-party coverage"—much like collision, comprehensive, medical payments or personal injury protection—and not as "third-party coverage" such as personal injury or property damage of public liability insurance (footnote omitted); and, R. Keeton, A. Widiss, Insurance Law, A Guide to Fundamental Principles, Legal Doctrines and Commercial Practices, (West, 1988) p. 399.

nation of the intent of the insured may be necessary to preservation of our public policy notion that a person cannot contract for protection from liability for injury caused by intentional, wrongful acts of the insured.[13] In third-party liability insurance cases, intent of the insured is synonomous with intent of the tortfeasor,[11] but not in first-party UM cases. Consequently, when issues of foreseeability of the injury or intentional tortious acts of the insured are raised, intent of the insured becomes relevant to the claimed insurance coverage. The certified questions in this case do not raise those issues.

The third certified question, however, is whether the cutting of the fuel line and the igniting of the fuel by Hain and Lambert constituted acts of independent significance to sever the causal connection. If the evidence establishes that the acts of an uninsured motorist, which were related to the transportation nature of the motor vehicle, resulted in or contributed to the injury, then causal connection exists between the use of the vehicle by an uninsured motorist and the injury. However, if the evidence establishes that acts of an uninsured motorist, which were not related to the trans-

portation nature of the motor vehicle, resulted in the injury and that the transportation use of the vehicle did not contribute to the injury, then any causal connection between the transportation use of a motor vehicle and the injury is interrupted and severed, such as in *Gilbertson.* Strict application of the rules of tort law is not required in deciding these causal connection fact issues in an insurance controversy between the UM insurer and its insureds.[15]

Under the facts certified to this Court, the acts of cutting the fuel line and igniting the fuel after the car was parked, which caused the car to burn, are so contrary to its transportation nature of the vehicle that, as a matter of law, these events are not related to its transportation nature and injury resulting therefrom is not within the UM coverage mandated by § 3636.

## IV.

## OPERATOR OF AN UNINSURED MOTOR VEHICLE INCLUDES ANY PERSON WHO IS ENGAGED IN ACTIVITY RELATED TO THE TRANSPORTATION NATURE OF THE VEHICLE.

 It is settled in this jurisdiction that a motor vehicle is uninsured when it is

13. In *Home State Life Insurance Co. v. Russell,* 175 Okla. 492, 53 P.2d 562 (1939) we examined the public policy notions against insuring one's self for liability resulting from one's intentional wrongdoing. Russell, the insured, was killed in the commission of a felony. Russell's intent at the time of contracting was controlling, notwithstanding his intent to commit a crime. We observed the rationale of South Carolina that the public good to be served by forfeitures to discourage lawlessness or crimes is to be balanced against the public good to be served by requiring payment of insurance to protect creditors and prevent dependents from becoming a public charge, an economic, social liability. In permitting the insured's beneficiary to recover, we rejected any presumption that the class of policyholders will go out in unlawful pursuits in order to recover under their policies, and refused to read risks of commission of a crime into the insurance policy which would necessarily cover every violation of the criminal code, including reckless driving. *Accord, Goodwin v. Continental Casualty Co.,* 175 Okla. 469, 53 P.2d 241 (1935) and *Union Accident Co. v. Willis,* 44 Okla. 578, 145 P. 812 (1915).

14. In *Spears v. Preble,* 661 P.2d 1337 (Okla.1983) we allowed recovery under a liability policy, even though the injury occurred while the in-

sured tortfeasor was a fleeing, suspected felon. The intent of Preble to commit a crime or to flee did not control. The facts demonstrated that Preble had no intent to cause the resulting damage. *See also, Employers Surplus Lines of Boston Massachusetts v. Stone,* 388 P.2d 295 (Okla.1963) finding no justification for exclusion of injury caused by assault and battery upon one insured partner by an employee, absent evidence that the assault was committed at the direction of the insured partnership; *Penley v. Gulf Insurance Co.,* 414 P.2d 305 (Okla.1966) finding no justification for exclusion of injury absent showing that insured intended the resultant damage; *Allstate Insurance Company v. Hiseley,* 465 F.2d 1243 (10th Cir.1972), finding justification for exclusion of injury resulting from high speed chase upon an objective testing of the intent of the insured as to the reasonable consequences of his intentional acts; and *Farm & City Insurance Company v. Potter,* 330 N.W.2d 263 (Iowa 1983) finding no justification for exclusion of property damage resulting from insured's intentional cutting of brake line on husband's automobile with intent to damage it, as evidence showed insured wife had no intent to cause any damage at time of accident.

15. *Uptegraft v. Home Insurance Co.;* footnote 8 supra.

driven by an uninsured operator. *State Farm Mutual Insurance Co. v. Wendt,* 708 P.2d 581 (Okla.1985). Neither the relevant facts nor the questions certified indicate that the coverage of the two victims or the involved automobile or the absence of coverage of the wrongdoers is at issue. Thus, the automobile, listed in the Safeco policy, was uninsured when it was operated by either of the wrongdoers. The certified relevant facts state that either or both wrongdoers, Hain and Lambert, did drive the automobile and, after both the insureds were locked in the trunk, Hain and Lambert were the sole operators of the automobile.

Insurers contend that neither Hain nor Lambert was an operator at the time the car was burned, citing *Heritage Insurance Company of America v. Phelan,* 59 Ill.2d 389, 321 N.E.2d 257 (1974). The *Phelan* case stands for the proposition that whether one is an operator is determined by acts indicating intent to operate the motor vehicle. Relying upon authority from several jurisdictions, the Supreme Court of Illinois concluded that the driver of an automobile continued to be an operator of the vehicle while stopped at a service station. At the time of the injury, the driver was standing beside the vehicle assisting with the repair of a heater hose. The Illinois court reasoned that the temporary interruption in the actual driving of the automobile for the repairs necessary to the continuation of the driving did not terminate control of the driver over the vehicle and that the repair activities were so closely related to the driving so that the driver remained the operator.

In *DeStefano v. Oregon Mutual Insurance Co.,* 762 P.2d 1123 (Utah App.1988), the Utah court examined the intent of the insured in determining his use of the vehicle at the time of the injury. The court concluded that the insured was "in, upon or entering into" as used in the statute and therefore occupying the vehicle where the insured was crushed between two cars when a third, uninsured car hit the second

car, reasoning that the facts clearly established every intention of the insured to immediately resume his journey and was in the process of doing so at the time of the injury.

As stated previously, § 3636 does not define "operator of an uninsured motor vehicle" or otherwise provide guidance for its interpretation. It is a common word and should be read in its ordinary sense.[16] Webster's Third New International Dictionary of the English Language Unabridged, 1963, at page 1581, defines operator as "1. one that produces a physical effect or engages himself in the mechanical aspect of any process or activity". Accordingly, we hold that "operator," as contemplated by § 3636, includes any person who is engaged in activity related to the transportation nature of the vehicle.

CERTIFIED QUESTIONS OF LAW ANSWERED.

OPALA, V.C.J., and HODGES, DOOLIN and KAUGER, JJ., concur.

HARGRAVE, C.J., and LAVENDER, SIMMS and SUMMERS, JJ., concur in result.

SUMMERS, Justice, concurring in result:

The majority would answer the first three certified questions by adopting the "chain of events" test as discussed in *Okla. Farm Bureau Mut. Ins. Co. v. Mouse,* 268 P.2d 886 (Okla.1954). I view that test as too broad, and I would define the appropriate standard to be the "causal connection" test, as discussed in my concurring in part/dissenting in part opinion in *Willard v. Kelley,* —— P.2d —— (Okla.1990). Instead of holding that an injury "arises out of the use" of a vehicle any time a vehicle is the dangerous instrument that starts the chain of events which leads to the injury, I would simply require that there be a causal connection between the inherent use of the vehicle and the injury.

---

**16.** 25 O.S.1981, § 1; *In re Certification of Question of State Law,* 560 P.2d 195 (Okla.1977); 47 O.S.1981, § 1–140 defines operator for purposes of the Highway Safety Code. The definition is tailored for drivers' licensing.

The first certified question asks whether the murders of Sanders and Houghton by being burned to death in the trunk of the automobile "arise out of the ... use of a motor vehicle" as contemplated by 36 O.S. 1981 § 3636. I would answer that question in the negative. As I urged in *Willard,* in order to fall within Section 3636, the injury must be causally connected to the inherent use of the vehicle. *See annotation,* 15 ALR4th 10 (1982). The vehicle must be more that the mere situs of the accident. *Criterion Ins. Co. v. Velthouse,* 751 P.2d 1, 3 (Alaska 1986). While the vehicle does not have to be the proximate cause, in the strict legal sense, the injury must at least relate to the inherent use of the vehicle. *Id.*

Rather than rely on "acts of independent significance" to sever the chain of events as the majority does, I would simply hold that as a matter of law the murders were not causally connected to the inherent use of the vehicle. While both rationales reach the same conclusion, the latter more narrowly defines the applicable test. This construction would allow for consideration of the contracting parties intent, while recognizing that a link between the vehicle and the injury must exist. *Sciascia v. Am. Ins. Co.,* 183 N.J.Super. 352, 443 A.2d 1118, 1122 (1982).

Here, the felonious deeds of Hain and Lambert accomplished the murders. The deaths did not arise out of the inherent use of the vehicle. Automobiles are for locomotion, not for imprisonment nor criminal incineration. Thus, while I agree that the U.M. carrier cannot be held liable, I do so for the reason that there is no causal connection between these tragic deaths and the inherent use of the vehicle.

As for the remaining questions, the view asserted here as to the first question makes it unnecessary to address them. It is immaterial whether there was an act of "independent significance," or whether the perpetrators of the crime were considered "operators" of the vehicle. Under any answers to those questions the insurer is simply not liable under the uninsured motorist provision, and that is because the deaths did not arise out of the inherent use of the vehicle.

I am authorized to state that Justice LAVENDER and Justice SIMMS join in these views.